544 So.2d 362 (1989)
CAJUN ELECTRIC POWER COOPERATIVE, INC., et al.
v.
LOUISIANA PUBLIC SERVICE COMMISSION.
No. 88-CA-1719.
Supreme Court of Louisiana.
May 3, 1989.
Rehearing Denied June 15, 1989.
*363 John Schwab, Schwab & Walter, Baton Rouge, James J. Thornton, Johnston & Thornton, Shreveport, W.M. Shaw, Shaw & Shaw, Homer, Rudolph McIntyre, Winnsboro, James B. Supple, Darnall, Biggs, Trowbridge, Supple & Cremaldi, Franklin, James J. Davidson, III, Davidson, Meaux, Sonnier & McElligott, Lafayette, Wendell Miller, Millican, Miller & Buisson, Jennings, James Funderburk, and Duval, Funderburk, Sundbery & Lovell, Houma, for plaintiffs-appellants.
Marshall Brinkley, Robert L. Rieger, Jr., Baton Rouge, Michael R. Fontham, Paul L. Zimmering, Noel J. Darce, and Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, for defendant-appellee.

ON REHEARING
DIXON, Chief Justice.
Rehearing was granted to reconsider whether article IV, § 21(B) of the state constitution, by explicitly granting to the commission the full authority over "all public utilities," removes the ability of the legislature to alter the commission's jurisdiction over any business defined as a public utility at the time the 1974 Constitution was adopted. We conclude that it does. Insofar as R.S. 45:1163 is inconsistent with this plenary authority, it is unconstitutional.

THE COMMISSION'S CONSTITUTIONAL JURISDICTION
Article IV, § 21(B) provides that the public service commission "shall regulate all common carriers and public utilities and have such other regulatory authority as provided by law." (Emphasis added). Our code provides that "[w]hen a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature." C.C. 9 (previously article 13 (1870)). The code further provides that "[t]he words of a law must be given their generally prevailing meaning." Id. article 11 (previously articles 14 and 15 (1870)). This court, when interpreting our constitution, should give effect to language that is plain and unambiguous. Bank of New Orleans and Trust Co. v. Seavey, 383 So.2d 354 (La.1980), on remand, 399 So.2d 642 (La.App. 4th Cir.1981), writ denied, 401 So.2d 1196 (La.1981). Explicit constitutional provisions are not subject to judicial construction and should be applied by giving words their generally understood meaning. State through Department of Highways v. Bradford, 242 La. 1095, 141 So.2d 378 (1962).
The cooperatives contend again, as they did in their original brief, that the words of article IV, § 21(B) are ambiguous. "When the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law." C.C. 10. If the words of a constitution are indeed ambiguous, a court may resort to the transcripts of the constitutional convention proceedings as an aid to find the purpose, intent, and meaning of those words. New Orleans Firefighters Association v. Civil Service Commission of City of New Orleans, 422 So.2d 402 (La.1982).
The majority in our original opinion, 532 So.2d 1372, did not address whether article IV, § 21(B) is ambiguous, agreeing instead with the cooperatives' contention that the drafters did not intend to change the jurisdiction of the commission in the new constitution. Article IV, § 21(B), however, is unambiguous. It clearly states that the commission shall have jurisdiction over all common carriers and public utilities and have such other regulatory authority as provided by law. The cooperatives' contention that the phrase "as provided by law" modifies the commission's jurisdiction over common carriers and public utilities would result in a solecism. The adverbial *364 phrase, "as provided by law," defines the conditions under which the commission shall have the "other regulatory authority" that the legislature may choose to grant.[1]
Since the provision is unambiguous, this court ought not base its decision on words used in argument at the convention proceedings but should instead rely on the product that the convention ultimately produced. City of New Orleans v. Scramuzza, 507 So.2d 215 (La.1987). The language that the voters of this state adopted granted, in mandatory language, constitutional jurisdiction to the commission over all common carriers and public utilities.[2] The legislature cannot by statute modify that jurisdiction. City of Baton Rouge v. Short, 345 So.2d 37 (La.1977).

PUBLIC UTILITIES
If electric cooperatives are public utilities, then the commission has regulatory jurisdiction over them. In 1970, the legislature amended R.S. 45:121 to include electric cooperatives on the list of businesses classified as public utilities. 1970 La. Acts No. 34, § 1. Thus, at the time the 1974 constitution was drafted and adopted, electric cooperatives were statutorily defined *365 as public utilities and were under the jurisdiction of the commission. See R.S. 12:426; Dixie Electric Membership Cooperative v. Louisiana Public Service Commission, 509 So.2d 1002 (La.1987). Electric cooperatives remain statutorily defined as public utilities. R.S. 45:121.[3]
Even though they are statutorily defined as being public utilities, the cooperatives contend that they are not the kind of public utility for which regulation by the commission was intended. Indeed, the constitution does restrict the commission's regulatory jurisdiction over one type of public utility, that being a utility owned, operated, or regulated by a political subdivision's governing body. La.Const. Art. IV, § 21(C). But neither the plain language of this constitution nor the record of the framers' debates indicates that the commission's jurisdiction over electric cooperatives should be curtailed. As noted above, the legislature defined cooperatives as public utilities at the time of the drafting and the adoption of the 1974 Constitution. Had the framers intended to except another kind of public utility from the commission's jurisdiction, they could have done so.[4]
*366 In addition, the cooperatives' argument that they are not the kind of utilities intended to be subject to regulation is undercut by the very statute they seek to have upheld as constitutional. R.S. 45:1163(B) allows electric cooperatives to choose to have rates and services regulated by the commission under the provisions of R.S. 12:426. If the structure and function of these cooperatives were such that regulation were unnecessary, it would be illogical for the legislature to have exempted them from regulation in R.S. 45:1163(A) and yet provided for them to choose to be regulated in R.S. 45:1163(B) and R.S. 12:426.

PREEMPTION OF STATE REGULATION BY THE REA
In 1935, President Roosevelt established the Rural Electrification Administration (REA)[5] in order to provide government loans at low interest rates to encourage electric service development in rural areas. As the Supreme Court has noted, the REA is a "lending agency rather than a classic public utility regulatory body...." Arkansas Electric Cooperative Corporation, 461 U.S. at 386, 103 S.Ct. at 1913. As such, it performs its role within state regulatory schemes. Id. Accordingly, state rate regulation of REA-financed cooperatives is not preempted by the Rural Electrification Act. Id. at 385, 103 S.Ct. at 1913.

ATTORNEYS FEES
Although the author of this opinion would decide the attorneys fees issue in favor of the commission,[6] the majority has *367 determined otherwise. The other justices of the court, three of whom subscribe fully to this opinion, and three of whom dissent on the jurisdictional issue but concur in the denial of the commission's claim for attorneys fees, conclude that the fee award should be denied for the following reasons.
The issue was decided in South Central Bell Telephone Co. v. La. Public Service Comm'n, 412 So.2d 1069 (La.1982), wherein it was determined that La.R.S. 45:1180 and 1181 did not authorize the commission to be reimbursed for attorney fees except in cases involving rate-making disputes. While La.R.S. 45:1180 and 1181 were amended by Act 561 of 1985, that amendment did not have the effect of broadening the types of cases in which the commission is entitled to attorney fee reimbursement. Instead, by amending R.S. 45:1180 and 1181, and enacting R.S. 45:1163.3, the Legislature created an economics and rate analysis division, and provided that in certain circumstances the commission could be reimbursed by parties examined by the economics and rate analysis division in rate-making matters. This case, a declaratory judgment action brought by the cooperatives, involves a jurisdictional dispute, not a rate-making examination by the economics and rate analysis division, so there is no statutory authority for an award of attorney's fees to the commission under these circumstances.
*368 Therefore, the request of the commission to have the cooperatives cast for the fees that the commission incurred in defending this declaratory judgment action is denied.

DECREE
Accordingly, the opinion of this court on original hearing is vacated, and the opinion of the district court concerning the jurisdiction of the commission is affirmed. The opinion of the district court awarding attorneys fees to the commission is reversed, and each party will bear its own costs.
MARCUS, WATSON and COLE, JJ., would grant a rehearing.
LEMMON, J., subscribed to the opinion the concurring reasons of CALOGERO, J.
WATSON, J., dissented and assigned reasons.
CALOGERO, J., subscribed to the majority opinion and assigned additional concurring reasons.
DENNIS, J., assigned additional reasons.
COLE, J., dissented in part and concurred in part and assigned reasons.
DIXON, C.J., assigned dissenting reasons on attorney fee issue.
WATSON, Justice, respectfully dissents, adhering to the views expressed in the original opinion and noting the following language from South Cent. Bell Tel. Co. v. Louisiana, Etc., 412 So.2d 1069 (La.1982):
"The 1974 Constitution streamlined the language of the provision but essentially afforded the Louisiana Public Service Commission the same powers and duties which it had under the former constitution.
* * * * * *
"While the language of the 1974 Constitution is different from that in the 1921 Constitution, there was no intention on the part of the delegates to the 1973 Constitutional Convention, nor on the part of the citizens of the state who voted to adopt the 1974 Constitution to change the authority of the Public Service Commission. Delegate Louis Lambert reported to the Convention that `the committee worked hard ... not to make any substantive change basically in that provision. The reasons for that was that apparently it had worked fairly well in the past. We didn't see any particular reason to tamper with it.' Volume IX. Records of the Louisiana Constitutional Convention of 1973 at 3008. Later in the discussion immediately preceding final adoption of the provision, delegate Pat Juneau reiterated the intent to `not make any change whatsoever in the present authority and jurisdiction of the Public Service Commission.'" 412 So.2d at 1072.
CALOGERO, Justice, subscribes to the majority opinion and assigns additional concurring reasons.
I join the majority opinion's holding that electric cooperatives are subject to the jurisdiction vested in the Public Service Commission by the Louisiana Constitution, as well as its determination that the Commission is not entitled to an attorney's fee award in this case. With respect to both of these issues, I assign the following additional reasons.

The Constitutional Issue
In South Central Bell Telephone Co. v. La. Public Service Comm'n, 412 So.2d 1069 (La.1982), the narrow constitutional question presented pertained to the power and authority of the Commission to "adopt and enforce reasonable rules regulations and procedures." Id. at 1072. That case involved a dispute over whether the Commission had either constitutional or statutory authority to charge attorney fees to South Central Bell for the Commission's intervention in a federal lawsuit in the United States Court of Appeal, D.C. Circuit. We did in that case note that the 1974 Constitution streamlined the language of the 1921 Constitution pertaining to the Commission. And in that case we did observe *369 that the new constitutional article essentially provided the Commission the same powers and duties relative to the adoption and enforcement of rules, regulations and procedures that it had under the former constitution. Furthermore, in that same context (the dispute over attorney fees and the Commission's power to enforce rules, regulations and procedures), we quoted constitutional convention delegate Juneau expressing the intent "not to make any change whatsoever in the present authority and jurisdiction of the Public Service Commission." Id., quoting Volume IX, Records of the Louisiana Constitutional Convention of 1973 at 3008.
However, that case did not entertain the question presented here, i.e., the Commission's constitutional authority over electric cooperatives. When first we entertained that question after adoption of the 1974 Constitution, in Dixie Elec. Membership Co-op v. La. Public Service Comm'n, 509 So.2d 1002 (La.1987), we pretermitted the issue as unnecessary to the decision in the matter before us, while nonetheless observing that the Commission's argument for constitutional authority over cooperatives was persuasive. Id. at 1007.
In my dissenting opinion on original hearing in this case, I expressed the view that cooperatives are subject to the constitutional regulatory authority of the Commission for essentially two reasons: (1) because electric cooperatives were statutorily defined as public utilities at the time that the convention delegates adopted Art. IV § 21(B) of the 1974 constitution, giving the Commission exclusive regulatory authority over "all common carriers and public utilities," and (2) because I found "no contrary intention" in the constitutional convention debates, i.e., no expressed intention not to have the cooperatives subject to the jurisdiction of the Commission under Art. IV § 21(B).
Although I generally adhere to the views expressed in my dissent on original hearing and join in the majority's disposition of this issue on rehearing, I now believe that the result reached on rehearing is supported by considerations not fully addressed in my original dissent, considerations which I take the opportunity to address here.
Regarding the intentions of the delegates to the constitutional convention, I believe that the records of the convention debate are simply not dispositive on this issue. It is true, as noted in South Central Bell, and by Justice Cole's separate opinions in this case, that Delegate Juneau and others stated at various points during the debate that Art. IV § 21(B) was not intended to effect a change in the law as regards the authority and jurisdiction of the Commission. However, these delegate statements were made in the context of a general debate over whether the Commission should have inherent constitutional authority to regulate common carriers and public utilities, or whether all authority of the Commission to regulate common carriers and public utilities should be subject to legislative approval.
As noted in footnote two of the majority opinion on rehearing, delegate Juneau and others feared that the wording of Art. IV § 21(B), as originally proposed (giving the Commission authority over "all common carriers and public utilities as provided by law ") would strip the Commission of all of its constitutional authority and make all of its regulatory authority dependent upon the Legislature. Delegates Juneau and Arnette argued that, as worded in the proposal, the provision would effect a major change in the law, eliminating in all respects the constitutional regulatory power which the 1921 Constitution provided to the Commission. The convention delegates then passed Juneau's amendment changing Art. IV § 21(B) to its present form, providing the Commission authority over "all ... public utilities." The adoption of this amendment prevented a major change in the law (making all constitutional authority of the Commission subject to legislative control), and provided the basis for statements by delegates such as Juneau to the effect that as amended, the article would not effect a change in the Commission's jurisdiction.
Leaving aside this general debate over whether the Commission should have constitutional *370 authority to regulate common carriers and public utilities (as opposed to having their authority subject to legislative control), I find no discussion or consideration by the delegates of the issue which is presented by this case: whether the adoption of Art. IV § 21(B), providing the Commission with regulatory authority over "all... public utilities," had the effect of subjecting to the Commission's regulatory authority those public utilities which were not specifically designated by the 1921 Constitution (as public utilities subject to the Commission's regulatory authority). Nor was there consideration or discussion of the type of entity which falls within the category of "public utilities." Nowhere were the references to not changing the authority and jurisdiction of the Commission made with reference to whether cooperatives were or were not public utilities or were or were not now subject to the Commission's jurisdiction.
Notwithstanding the aforementioned language in South Central Bell, discussed in the context of a different issue, and notwithstanding the remarks of some convention delegates during a debate over an issue not presented here, it is an inescapable conclusion that Art. IV § 21(B) did change the law in at least one significant respect. Under the 1921 Constitution, the Commission was given constitutional authority over only those types of public utilities and common carriers specifically delineated in Art. VI § 4. As Justice Dennis stated in his dissenting opinion on original hearing, the 1974 constitutional provision, by eliminating the reference to specific types of carriers and utilities and generically providing that the Commission shall regulate all public utilities, "represents a marked shift in philosophy from the 1921 Constitution's public service commission section."
The import of this change is self-evident. The common carriers and public utilities subjected to the Commission's constitutional authority are no longer defined by the Constitution itself. Rather, the determination of what types of businesses fall within the generic phrase "all ... public utilities" must be made by the courts. And we surely cannot resolve this issue properly on the simplistic assumption that the term "public utilities" as used in the 1974 Constitution includes only those public utilities which the 1921 Constitution specified as subject to direct regulation by the Commission, primarily because electric cooperatives did not exist in 1921, and also because if the delegates had intended the definition of "public utilities" to be so limited, presumably they would have said so (which they easily could have done through a verbatim reenactment of the 1921 Constitution).
Justice Cole's dissent on this issue rests on the premise that, in reality, we are still to be governed by Art. VI § 4 of the 1921 Constitution, for the reason that Art. IV § 21(B) of our present constitution is but a shorthand reenactment of the 1921 provision. This premise I do not accept. The 1974 provision is different in content and construction, and our task in this case has been to interpret the extant meaning of that provision.
In attempting to interpret the meaning of that provision it is appropriate to look at both the definition of "public utility," and existing legislation which in 1974 defined electric cooperatives as public utilities. Consideration of both of these factors leads me to the conclusion that the constitutional phrase "all ... public utilities" includes electric cooperatives.
First of all, it is apparent that electric cooperatives do in fact share the common characteristics possessed by public utilities. While the term public utility perhaps has no precise definition, the majority opinion on rehearing (footnote 3) notes that the most common characteristics of such an entity include: providing a service essential to the public interest, providing that service to all who apply, at reasonable and non-discriminatory prices, and providing a service the nature of which lends itself to monopolization. A company which provides the essential service of home and business electrical power is a public utility in the most conventional sense that the term is used. F. Welch, Cases and Text on Public Utility Regulation at 2 (1968).
*371 It has been argued that because cooperatives are privately owned by the users of the electricity, they need not be subject to the same degree of governmental regulation required for investor-owned electric utilities. Assuming, arguendo, that this is true, it is irrelevant for the purposes of the issue at hand. Even if cooperatives, due to differences in ownership or management structure, require less regulation than other types of public utilities, that does not mean that they are not public utilities in the first instance. As one commentator has noted, the inquiry into whether a company is a public utility turns upon the nature of the services provided by that company, not the structure of its management or ownership. See Welch, Cases and Text on Public Utility Regulation, supra at 4 ("the term `public utility' ..., by itself, ... refers only to the nature of the business, not to its ownership or operation.") Furthermore, the 1974 Constitution makes no distinction, based on the amount of governmental regulation needed or otherwise, between kinds of public utilities, but simply provides that they all shall be regulated by the Commission.
Secondly, at the time that the 1974 constitutional provision was enacted, electric cooperatives were treated by statute as public utilities subject to the regulatory authority of the Commission. I agree with Justice Dennis that a legislative act cannot define a constitutional phrase, and therefore do not suggest that the existence of the legislative acts is dispositive of the overall issue. Yet in attempting to determine whether cooperatives are "public utilities," I find the fact that the Legislature had chosen to define them as such, a persuasive indication that a cooperative is in fact the type of entity traditionally considered to be a public utility. Furthermore, the fact that electric cooperatives had been statutorily defined as public utilities for three years prior to the adoption of the new constitutional provision could hardly have been a secret to the delegates to the constitutional convention.
The foregoing considerations convince me that electric cooperatives are subject to the Commission's constitutional authority to regulate "all ... public utilities," and therefore I join the majority's ruling on that issue.

Attorney Fees
As noted at the outset of this opinion, I join the majority's decision to deny the Commission's claim for attorney fees in this case.
The minority view on this issue, set forth by Chief Justice Dixon in footnote six to the majority opinion, is that 1985 La. Acts 561, § 1 effected a change in the law by broadening the types of cases or legal disputes under which the Commission is entitled to recover a fee award. The implication of this argument is that Act 561 was designed to overrule or modify our holding in South Central Bell, wherein we held that La.R.S. 45:1180 and 1181 did not authorize a fee award to the Commission in a case that did not involve a rate making dispute. I strongly disagree with these arguments.
At the time South Central Bell was decided (1982), La.R.S. 45:1180 permitted the Commission to retain special counsel "in rate making cases or the judicial review thereof," and La.R.S. 45:1181 provided that "counsel may be retained and fees certified (1) to evaluate and review proposed rate increases, and (2) to represent the Public Service Commission in rate making cases or the judicial review thereof."
The title of Act 561 of 1985 recites that its purpose is "to create an economics and rate analysis division of the Public Service Commission" and "to provide for employing consultants and attorneys to assist the economics and rate analysis division; [and] to provide for payment of such services." (Emphasis added). To accomplish these purposes, Act 561 enacted a new statute, La.R.S. 45:1163.3, and amended two existing statutes, La.R.S. 45:1180 and 1181.
La.R.S. 45:1163.3(A) provides for the creation of the economics and rate analysis division "[i]n order to assist the commission in making an examination of the affairs of any person doing a public service or public utilities business in Louisiana concerning *372 matters affecting services and rates charged Louisiana consumers ...." Section 1163.3(B) empowers the Commission to hire outside counsel "[i]f the staff of the economics and rate analysis division is unable or insufficient to assist the commission in ... matters affecting services and rates...."
As amended, La.R.S. 45:1180 and 1181 further define and restrict the circumstances under which the economics and rate analysis division may retain outside counsel and may be reimbursed for outside counsel's services by a party examined in a rate making dispute. Section 1180 provides that "[a]ttorneys or special counsel may be retained by the commission to assist the economics and rate analysis division for the purpose of evaluating and reviewing matters affecting services and rates charged by public utilities to Louisiana consumers and for representing the Public Service Commission in such cases or the judicial review thereof." Section 1181 further provides that the Commission "shall employ only such ... attorneys or special counsel... as are actually necessary to assist the economics and rate analysis division in conducting the examination," and that compensation for attorney services "shall be fixed according to the time actually devoted to the work of conducting the examination and making reports thereon...."
Under these three statutes (newly enacted § 1163.3 and §§ 1180 and 1181, as amended), the only instance in which the services of outside counsel may be retained, much less charged to a third party, is when legal assistance is required by the economics and rate analysis division. By statute, that division's function is to handle rate-making examinations for the commission, and outside attorneys may be retained only as "actually necessary to assist the economics and rate analysis division in conducting the examination." La.R.S. 45:1181.
It is undisputed that this case does not involve a rate making examination by the economics and rate analysis division. This is a jurisdictional dispute between the cooperatives and the Commission. There is no statutory basis for authorizing payment of attorney fees to the Commission under these circumstances, just as there was no statute which authorized the fee award sought in South Central Bell. I find nothing in the plain wording of the statutes which even hints that Act 561 was intended to overrule or modify our holding in South Central Bell, and no legislative history supporting such an intention has been cited. To the contrary, it appears that the purpose of Act 561 was simply to create an economics and rate analysis division for the stated purposes of handling rate making examinations, and to continue in force the provisions of §§ 1180 and 1181 which, both before and after Act 561, authorized the Commission to retain and be compensated for outside attorney services in rate making disputes.
Finally, one of my dissenting brethren argues in his concurring and dissenting opinion that there is "irony" and a "fundamental fallacy" in the majority's decision to deny an attorney fee award based upon its interpretation of the pertinent statutes, while at the same time holding that the Legislature has no power to restrict the constitutionally based regulatory authority of the Commission. This argument ignores the fact that there is no constitutional authority for the Commission to collect attorney fees, as we explicitly held in South Central Bell, supra. So any such authority must be provided by statute, and the statutes relied upon by the Commission do not apply to this case. On the other hand, the question of whether the Commission has constitutional authority to regulate electric cooperatives is a matter separate and distinct from whether the Commission may charge or be entitled to attorney fees. It is simply not contradictory for the majority to conclude that while the Commission has constitutional authority to regulate cooperatives, it has no authority, by the constitution under any circumstances or by statute in this particular case, to collect attorney fees. The simple fact is that the Commission has no constitutional authority regarding attorney fees. So the majority's determination that the statutes do not permit a fee award in this case cannot logically be interpreted as inconsistent with its *373 separate determination that the Commission has regulatory power over the cooperatives that is based in the constitution.
DENNIS, Justice, expressing additional reasons.
I join in the majority opinion on rehearing for the reasons expressed therein and also for the reasons expressed in my dissenting opinion on original hearing. The constitutional grant of regulatory powers to the public service commission over all common carriers and public utilities is an exception to the plenary power of the legislature. Consequently, legislatively enacted rules of statutory construction and former legislative treatment of cooperatives as entities subject to regulation cannot affect this court's separate, independent and exclusive judicial power to interpret the constitution's meaning of "common carrier" or "public utility". Therefore, I construe the court's discussion of legislated law to be analogical and supplementary, and not essential, to its opinion.
COLE, Justice, dissenting in part and concurring in part.
At the beginning of its opinion, the majority notes that under the Civil Code "when a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written...." La.C.C. art. 11 (emphasis added). If, as the majority asserts, the provisions of La. Const. Art. IV, sec. 21(B) are "unambiguous," it is difficult to understand why this Court has been compelled to hear this matter twice and why it has arrived at two contradictory conclusions. Moreover, the majority's result leads to consequences that may be termed "absurd," and these future difficulties are foreshadowed by the logical inconsistencies of the majority opinion. Accordingly, I respectfully dissent on the jurisdictional issue.
The linchpin of the majority opinion is, unfortunately, a logical paradox. In footnote 3, the majority states: "[W]e base our decision in this case on the existence since 1970 of a legislative definition of electric cooperatives as public utilities...." In virtually the same breath, however, it concludes the 1974 Constitution "removes the ability of the legislature to alter the commission's jurisdiction" because of the "plenary authority" of the Public Service Commission. At 363. The majority does not explain how the legislature can be at once the source of the commission's regulatory jurisdiction over cooperatives and at the same time powerless to legislate on this question under the constitution because the commission is the sole power. The rest of the majority opinion constitutes an attempt to justify this initial fallacy.
The majority opinion attempts to resolve this fundamental paradox by the argument that the 1974 Constitution somehow "froze" the extant legislation concerning commission jurisdiction over electric cooperatives into Article IV, sec. 21(B). Several factors militate against such a conclusion.
Most significantly, neither the language nor the history of Section 21(B) reflects any intent to lock the existing statutory regulatory scheme into the constitution. The majority is correct when it notes the framers sought to preserve the "status quo" in Art. IV, sec. 21(B). It is obvious, however, that the status quo to be preserved was the allocation of power between the commission and the legislature under the 1921 Constitution, not the statutory regulatory scheme in place in 1973. As Justice Calogero observed in South Central Bell Telephone Co. v. Louisiana Public Service Comm'n, the 1974 Constitution "streamlined" the language of the 1921 Constitution but the power, authority and duties of the Public Service Commission remained unchanged. 412 So.2d 1069, 1072 (La. 1982). Delegate Juneau, who proposed the language that became Section 21(B), and upon whose remarks the majority places great weight, made this abundantly clear:
The amendment which I proposed is not to make any change whatsoever in the present authority and jurisdiction of the Public Service Commission. Whatever act you may have passed in the legislature relating to the Public Service Commission, could be passed in 1975, 1976 *374 or '77.... If you have authority in the legislature to pass an act relating to the Public Service Commission, whatever those acts are today, I think you would have the same authority under this amendment to pass that type of legislation.
IX Records of the Louisiana Constitutional Convention of 1973: Convention Transcripts 3347 (105th Days Proceedings; December 20, 1973). In 1978, the legislature exercised "the same authority under this amendment" to again exempt the rural electric cooperatives from commission control.[1]
The majority's holding that the 1974 Constitution elevated an existing statutory scheme to the level of constitutional law represents a frightening and unprecedented aberration in constitutional interpretation. The plain language of sec. 21(B) does not support this claim, nor does the history of the constitutional convention debates. Absent any such authority, I can find no precedent in our jurisprudence for finding that because the commission had jurisdiction over the cooperatives by virtue of a legislative act in existence in 1974, the legislature is powerless to enact legislation altering its prior enactment.
Does the majority opinion not prevent the legislature from altering its own prior enactment? Logically speaking, it does.[2] Yet, can anyone seriously contend the legislature does not have the plenary power to amend its prior enactment concerning cooperatives? Nowhere in the Constitution is the legislature prohibited from doing so. Absent clear and convincing evidence that it was the constitutional aim to deny the legislature the power to modify the law in existence in 1974, our jurisprudence clearly establishes the legislature retains this power. See Board of Directors of Louisiana Recovery District v. All Taxpayers, Property Owners and Citizens of the State of Louisiana, 529 So.2d 384, 387-388 (La. 1988) (per Dennis, J.).
Equally unpersuasive is the majority's reliance on the fact that the framers of Article IV, sec. 21(B) did not expressly exempt electric cooperatives from commission jurisdiction.[3] It is similarly undisputed that the framers did not expressly define cooperatives as public utilities and place them under the commission's constitutional *375 jurisdiction. The argument from silence cuts both ways. Where the Constitution is silent, the otherwise plenary power of the legislature prevails. As we observed in Guillory v. Department of Transportation and Development: "It is a fundamental principle of judicial interpretation of state constitutional law that the legislature is supreme except when specifically restricted by the Constitution." 450 So.2d 1305, 1308 (La.1984); see also Board of Directors of Louisiana Recovery District, supra.
In seizing upon the 1970 statute granting the commission regulatory power over cooperatives to justify its result in this case, the majority ignores prior decisions of this Court. In Central Louisiana Electric Co. v. Louisiana Public Service Comm'n, 251 La. 532, 205 So.2d 389 (1967), we held electric cooperatives were not subject to the commission's inherent power under the 1921 Constitution. Accord, Central Louisiana Electric Co. v. Louisiana Public Service Comm'n, 253 La. 553, 218 So.2d 592 (1969). In South Central Bell Telephone Co., supra, we held the 1974 Constitution did not change the authority of the Public Service Commission. 412 So.2d at 1072. Justice Calogero noted: "While the language in the 1974 Constitution is different from that in the 1921 Constitution, there was no intention on the part of the delegates to the 1973 Constitutional Convention, nor on the part of the citizens of the state who voted to adopt the 1974 constitution to change the authority of the Public Service Commission." Id. Since the commission therefore had no inherent authority over cooperatives under the 1921 Constitution, and since the 1974 Constitution did not change the authority of the commission, it follows logically that the commission has no inherent, "plenary" authority over electric cooperatives under the 1974 Constitution. The majority does not rebut or even confront this formidable obstacle; it simply ignores it.
The majority opinion also fails to address the problem of the commission's acquiescence in the legislature's decision to exempt electric cooperatives from commission jurisdiction. From 1970 to 1978, the commission regulated cooperatives under a statutory grant of power. By 1978 La. Acts 77, the legislature went back to the pre-1970 regulatory scheme and exempted the cooperatives from commission control under the conditions set out in the statute.[4] From 1978 to 1987, the commission acquiesced in the legislature's decision. In several letters to the cooperatives that are in the record below, the commission disclaimed regulatory jurisdiction over them on the basis of R.S. 45:1163. This Court has previously found that such acquiescence in an established regulatory scheme by the alleged regulator is persuasive evidence of the correctness of the existing regulatory plan. See State v. City of New Orleans, 151 La. 24, 91 So. 533 (1922).[5] Here, we are asked to "discover" a new source of plenary power in the commission, yet the majority fails to address *376 the issue of its acquiescence for 10 years in the legislative enactment it now challenges.[6]
In light of the logical fallacies generated by the majority in its attempt to justify its result by constitutional analysis, it is small wonder that it descends into the murky realms of public policy and regulatory economics in an attempt to justify its conclusion. The majority implicitly rejects the finding of the Utah Supreme Court in the seminal Garkane decision,[7] i.e., that regulation of electric cooperatives is not necessary because of the identity of interests between producer and consumer. But the majority offers no countervailing analysis. The Garkane court's economic observations are borne out by the record in this case which shows the high degree of managerial control exercised by the members of the cooperatives before us. The majority does not discuss the managerial and economic picture presented in this case. Rather, it decides, on a theoretical level, that pervasive government regulation of electric cooperatives is necessary to attain some abstract "good."
The majority then attempts to piggy-back its policy determinations onto its constitutional analysis by stating it declines to second-guess the judgment of the constitutional framers who did not expressly exempt cooperatives from commission jurisdiction. The circle is complete and the majority is left with the weak argument from silence criticized above.

* * * * * *
As regards the issue of attorney fees, I concur with the decretal portion of the opinion reversing the award by the trial court. The opinion, as originally presented to the court by its author, proposed the language now relegated to footnote six. A signatory to the jurisdictional issue, apparently seeking to bolster the opinion by avoiding the necessity of dissenting in part, sought the inclusion of the material now in the body of the opinion. This cosmetic effect nonetheless leaves only three justices of the "majority" adhering to the denial of fees. Although a majority has finally adopted the view of the attorney fee issue to which I have consistently adhered throughout the pendency of this matter before the court, the fundamental fallacy in the majority's analysis of the jurisdictional question remains.
With no apparent sense of irony, this court decides the legislature has the power to restrict the commission's assessment of attorney fees by statute, while at the same time the court holds the same legislature has no authority to statutorily limit the commission's "plenary authority" to regulate electric cooperatives.[8] This tension between the positions is almost palpable and underscores the weakness of the majority's position on the jurisdictional issue. Justice Calogero, in his additional concurring reasons, makes a vain attempt to reconcile this central paradox of the majority opinion. His efforts fail because if the commission's regulatory power is "plenary" as the majority asserts, it does not need additional explicit constitutional authority to tax its attorney fees by fiat. To conclude otherwise is to rob the phrase "plenary authority" of meaning and remove the main support for the majority's conclusion on the constitutional issue. Faulty, post hoc rationalizations to justify a predetermined result are no substitute for logical reasoning. In addition, if there is any question as to how the Public Service Commission interprets *377 its "plenary authority" in the context of legislative enactments, one need only observe its actions with respect to the Public Records Act. See, f.n. 10 of these reasons, infra. It obviously does not believe its "plenary authority" pertains only to its regulatory jurisdiction.
Assuming, arguendo, that R.S. 45:1163.3 and 45:1180-1181 are still constitutionally sound, these statutes do not justify taxing the membership of the plaintiff cooperatives with the commission's attorney fees. To so hold would be to ignore the declaratory nature of the relief requested. All the cooperatives sought was a declaration on the constitutionality of a statute: R.S. 45:1163. R.S. 45:1180-1181 only permit the commission to tax attorney fees in "investigations" by the commission's "economics and rate analysis division" in "matters affecting services and rates." The relationship between the threshold question of the constitutional, declaratory judgment action and electric services and rates is extremely tenuous.[9]
It is clear from the record that the fees counsel for the commission seeks were not incurred in the course of "an examination of the affairs" of these cooperatives "concerning matters affecting services and rates." R.S. 45:1180(A). Mere intent to regulate is insufficient. The commission incurred the fees while seeking to have R.S. 45:1163 declared unconstitutional in a suit seeking a declaration of constitutionality filed by the cooperatives. The fees to be taxed must also be incurred to "assist the economics and rate analysis division" in conducting this "examination." Id. Counsel for the commission admitted the commission's "economics and rate analysis division" does not exist in reality. Finally, it is circular to say that fees are properly taxed to the cooperatives since the cooperatives are public utilities under the plenary jurisdiction of the commission. That was the question presented in this declaratory judgment action; it does not involve matters relating to services or rates.
R.S. 45:1181 is properly read in pari materia with R.S. 45:1180, and it imposes additional restrictions on the commission's power to tax fees. Under R.S. 45:1181, the attorneys employed to assist the economics and rate analysis division must be "actually necessary" to the "examination." Furthermore, the compensation due these outside employees depends on time spent "conducting the examination and making reports thereon" or "as participants in any judicial review of the examination or reports." R.S. 45:1181(A). In this case, the attorneys for the commission claim fees for the litigation of the threshold jurisdictional question; no "examination" of the cooperatives has taken place nor have "reports" been prepared. Furthermore, this is not a case involving judicial review of a commission "examination" since no "examination" has taken place. Accordingly, R.S. 45:1181 does not authorize the taxing of fees given the procedural posture of this matter.
R.S. 45:1181 requires that the fees be "reasonable." At present, three attorneys have allegedly been employed by the commission and they have incurred fees in excess of $100,000.00. These fees, which will be passed on to consumers, have not been subjected to close judicial scrutiny as to their "reasonableness." Nor has it been demonstrated that the services are "actually necessary to assist the economics and rate analysis division" in an "examination" of the cooperatives. R.S. 45:1181(A). Likewise, it has not been demonstrated that the three attorneys are "actually necessary." The cooperatives properly filed a Rule under R.S. 45:1181(B) challenging the fee assessment. This Court, under its authority to regulate the practice of law, has seen fit to question the reasonableness of attorney fees sought in other cases. See, e.g., City of Baton Rouge v. Stauffer Chemical Co., 500 So.2d 397 (La.1987); *378 Leenerts Farms, Inc. v. Rogers, 421 So.2d 216 (La.1982). This Court certainly owes it to the consumers who must ultimately pay the substantial fees involved here to subject these fees to close judicial scrutiny. For all these reasons, I agree that the commission has no authority to tax its attorney fees to the plaintiff cooperatives.

* * * * * *
The logical problems that mark the majority opinion are an inevitable consequence of the result it strives to reach. By concluding the commission's power over electric cooperatives is at once the product of a 1970 legislative act and at the same time the product of the commission's "plenary authority" under the 1974 Constitution, the majority sets out a self-contradictory proposition. In such a situation, one should examine the soundness of one's premises since both cannot be true.
The majority seems oblivious of the potential sweep of its holding in this case. The constitutionality of virtually all legislation pertaining to the Public Service Commission is highly suspect in light of the majority's newly discovered "plenary authority." At the same time, however, the majority relies on statutes that conflict with the commission's "plenary" power in denying attorney fees to counsel for the commission. This opinion raises more questions than it answers. Do the protections of the Louisiana Public Records Act apply to the Commission?[10] Are the other provisions of Title 45 of the Revised Statute relating to public utilities and common carriers valid or do they fall before the "plenary authority" of the commission?[11] This Court will be forced to resolve these and other troublesome questions in light of the grim spectre raised by this opinion of a "Fourth Branch of Government" not subject to any legislative act it deems contrary to its "plenary authority." These are but a few of the "absurd consequences" that result from the majority's reading of Article IV, sec. 21(B).
The majority's decision is contrary to settled rules of constitutional interpretation. It is logically inconsistent, unsupported in light of statutory and jurisprudential law, and unsupported by the record in this case. Accordingly, I am compelled to dissent.
NOTES
[1] Adverbial clauses, although usually available for various stylistic placements in a sentence, are more restricted when, as here, a sentence contains more than one verb. In such sentences, the rule of propinquity dictates that the adverbial clause follow the verb modified. See Buckler, American College Handbook of English Fundamentals §§ 39-39a. pp. 253-258 (2d ed. 1965).
[2] Even if resort to the convention proceedings were appropriate in this case, those proceedings would only affirm the clear language of the provision. Justice Cole in his concurrence to our original opinion correctly pointed out that the majority of the delegates wanted to maintain the status quo insofar as the commission's jurisdiction was concerned. A careful reading of the transcripts reveals, however, that the "status quo" was not the dual approach to the commission's jurisdiction under the 1921 Constitution. Instead, the "status quo" the delegates sought to protect was the commission's plenary constitutional jurisdiction over all public utilities.

Article IV, § 21(B) as originally drafted provided that the commission would regulate "all common carriers and public utilities as provided by law." Delegate Arnette proposed an amendment that would have deleted "as provided by law" in order to preserve the commission's jurisdiction:
"[T]here is definite constitutional jurisdiction in the old 1921 Constitution. Under the new proposal, there is none whatsoever. The Legislature must provide any jurisdiction that the Public Service Commission has by virtue of these four words." Louisiana Constitutional Convention Records Commission, Records of the Louisiana Constitutional Convention of 1973: Convention Transcripts, vol. IX, p. 3008 (1977). Delegate Arnette's amendment was defeated. But several days later, Delegate Juneau was still concerned that the section as proposed had indeed changed the law and stripped the commission of constitutional jurisdiction. He proposed as a second amendment the language that became § 21(B):
"[I]f we're going to put into the constitution a commission which will regulate common carriers and public utilities, you have, in effect, destroyed the constitutionality of that provision by in turn saying, `as provided by law.' It makes sense that by a mere legislative act, you could strip away the authority of the Public Service Commission to regulate common carriers and public utilities. I might further add that if we were to leave this language alone, you are making a drastic change in the current law.... I think the intent was, of this convention, to put the authority to regulate common carriers and public utilities in the exclusive jurisdiction of the Public Service Commission." Id. at 3346. Juneau then offered his amendment to preclude "in the future ... the legislature completely stripping the Public Service Commission of duties that I think we fully intend to give them." Id.
Both Delegate Jenkins and Delegate De Blieux spoke against the Juneau amendment, emphasizing that the amendment limited the power of the legislature to control the commission's regulation of common carriers and public utilities. Id. at 3349. Delegate Derbes also emphasized in his objection to the amendment that it prevented the legislature from defining the term "public utilities." Without the Juneau amendment, Derbes contended, the legislature retained control over the definition of common carriers and public utilities. But with the amendment, the jurisdiction of the commission could not be modified by legislative act: "If you [define public utility or common carrier] by judicial interpretation you give the Public Service Commission jurisdiction, and there's no way we can get something that's been given such jurisdiction away ... even though we might pass a legislative act doing so, it could not modify this constitution once the courts so declared it." Id. at 3348.
Nevertheless, the amendment so restricting the legislature was adopted by the delegates and later by the people.
[3] Although we base our decision in this case on the existence since 1970 of a legislative definition of electric cooperatives as public utilities, we do recognize that an approach often used by economists and by the highest courts in other states in defining "public utility" focuses not on legislative definition but rather upon the nature of the service rendered that makes regulation appropriate. Similarly, this court, in Gulf States Utilities Co. v. Louisiana Public Service Commission, 222 La. 132, 145, 62 So.2d 250, 254 (1954 [1952]), determined that an investigation of the characteristics of a business is essential to determine "whether a particular business is or has become a public utility...."

The concept of a public utility is a legal one that has developed from the conflict between the economic, social, and political forces seeking to control monopolies and those businesses regularly providing the essential services and commodities that are most efficiently produced in a monopoly setting. See Bonbright, Principles of Public Utility Regulation 8 (1961); see also generally Phillips, The Regulation of Public Utilities ch. 1 (1988); Barnes, The Economics of Public Utility Regulation 42 (1942):
"Public utilities are distinguished from other businesses by the formal obligations to the public which are imposed upon such companies. Utility enterprises must serve all who apply for the service at reasonable and non-discriminatory prices. They must be prepared at all times to render a service that is adequate both in quality and in quantity, and moreover the services must be immediately available when consumers demand service. In the absence of an alternative, the consumer must take service from the only available utility, and it is, therefore, appropriate that the company should be under a legal obligation to provide the service at a reasonable price."
Even if the legislature had not defined electric cooperatives as public utilities, under this analysis, we believe the outcome in this case would be the same. The record reflects that the plaintiffs are electric cooperatives with a monopoly in their respective service areas to market electricity, an essential product. As a condition of that monopoly, they must provide quantity and quality service on demand to all who are willing to become members of the cooperative. In return, the cooperatives enjoy protection from competition because other utilities cannot intrude on their service areas. See R.S. 45:123. Without such protections, the economics of scale and technology, coupled with the extensive capital outlays required for start-up alone, would make it impossible for the cooperatives to fulfill their commitments. See generally Schmalensee, The Control of Natural Monopolies 27-43 (1979).
[4] Since the 1974 Constitution does not make a distinction between cooperatives and other "types" of utilities, the question of whether they should be regulated is not before this court. Because our original opinion relied on this contention, however, we do recognize the theoretical underpinnings of the cooperatives' argument. The theory that electric cooperatives are not the kind of utilities that should be regulated has its genesis in Garkane Power Co. v. Public Service Commission, 98 Utah 466, 100 P.2d 571 (1940). In that case, the Utah Supreme Court determined that there was no conflict between consumer and producer interests as far as cooperatives were concerned. Such a conflict can arise in situations where rates are so high that many who need service can't afford it, or so low that investors do not get a fair rate of return on their investment and, consequently, do not reinvest to secure adequate service.

The court reasoned that consumer and producer interests were one and the same: "If rates are too high, the surplus collected is returned to the consumers pro rata. If rates are too low the consumers must accept curtailed service or provide financial contribution to the Corporation." Id. at 471, 100 P.2d at 573.
Although this reasoning was approved in Salt River Project Agricultural Improvement & Power District v. Federal Power Commission, 391 F.2d 470, 473 (D.C.Cir.1968), cert. denied, sub nom Arkansas Valley G & T, Inc. v. Federal Power Commission, 393 U.S. 857, 89 S.Ct. 104, 21 L.Ed.2d 126 (1968), the United States Supreme Court cast doubt upon the continued validity of that rationale in Arkansas Electric Cooperative Corporation v. Arkansas Public Service Commission, 461 U.S. 375, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983). In affirming the jurisdiction asserted by the commission over the cooperatives, the court recognized that the cooperatives' self-regulating method of ownership did not prevent them from engaging in "economically inefficient behavior." Id. at 394, 103 S.Ct. at 1917 (citing R. Schmalensee, The Control of Natural Monopolies 90-93 (1979)). The comment by Schmalensee to which the court referred noted that "[c]ontrol by a board of amateurs from among the cooperative's membership ... would likely encounter difficulties of ensuring that sufficient skills and resources were applied to the control function. If the enterprise is at all complex, managerial sloth ... is difficult for outsiders to detect. Yet, under cooperative ownership, it, along with politically motivated pricing, seems a principal danger." Schmalensee at 92.
Accordingly, the Court declined to second-guess the state's judgment that some degree of oversight was needed. In the case at bar, the drafters of the constitution did not remove cooperatives from the commission's jurisdiction when the constitution was drafted. We, too, decline to second-guess their judgment.
[5] Executive Order No. 7037 (issued May 11, 1935).
[6] The author of this opinion expresses the following view on the attorney fee issue.

Since the cooperatives are public utilities under the plenary jurisdiction of the commission, the commission may certify to them the expenses it incurs in matters affecting the services they offer and the rates they charge. Under the provisions of R.S. 45:1163.3, the commission has the power to hire special counsel to assist the economics and rate analysis division "in making an examination of the affairs of any ... public utilities business ... concerning matters affecting services and rates ... or for representing the Public Service Commission in [these matters] or the judicial review thereof." (Emphasis added). R.S. 45:1163.3(A). Subsection B empowers the commission to retain attorneys to assist the division if the division's own staff cannot or is insufficient to handle matters affecting services and rates.
R.S. 45:1180(A) allows the commission to certify to the public utility being examined the expenses incurred by the commission in its examination of that business' affairs concerning matters affecting services and rates. Subsection B allows the commission to retain special counsel to assist in the evaluation and review of matters affecting services and rates and to represent the commission in judicial review proceedings.
R.S. 45:1181(A) restricts the commission's employment of special counsel to "necessary" attorneys and requires that the compensation paid be "reasonable and commensurate with the value of the services performed." Subsection B allows the business being examined to challenge by rule the fees certified to it by the commission within fifteen days of their certification.
The record in this case reflects that on November 23, 1987, special counsel for the commission presented its statement for $43,500.00 in professional services rendered and $1,928.75 in costs incurred in this matter to the commission. On January 8, 1988, the commission secretary certified pro rata those expenses to the seven plaintiffs in this suit, pursuant to the terms of R.S. 45:1180 and 1181. The plaintiffs then challenged the fees certified by a timely filed rule, contending that the certification of the fees was arbitrary, unreasonable, and unnecessary under §§ 1180 and 1181 because the fees were not incurred by the commission in a matter affecting service or rates. Instead, the cooperatives argued that the commission incurred the fees and expenses in defense of the plaintiffs' "Joint Petition for Declaratory Judgment and Relief," a proceeding they characterized as a jurisdictional matter rather than one affecting services and rates.
In support of their position, the cooperatives point to this court's decision in South Central Bell Telephone Co. v. Louisiana Public Service Commission, 412 So.2d 1069 (La.1982), holding that the commission could not certify to a utility the expenses incurred by special counsel in its intervention in a case only indirectly affecting the rates charged consumers in Louisiana. At that time, however, R.S. 45:1180 restricted the certification of special counsel expenses to those incurred "for the purpose of evaluating and reviewing proposed rate increases and for representing the Public Service Commission in rate making cases or judicial review thereof." In 1985, the legislature amended § 1180 to provide for the certification of all expenses incurred by the commission in its examination of a public utility concerning matters affecting services and rates charged. 1985 La. Acts 561, § 1. In the same act, the legislature added § 1163.3, establishing the economics and rate analysis division and empowering the commission to retain special counsel to assist it in matters affecting services and rates. 1985 La. Acts 561, § 2.
Under the broader terms of §§ 1180 and 1163.3, if the commission incurred the professional fees and expenses certified to the plaintiffs in a matter affecting services and rates, those fees and expenses are properly charged to the cooperatives, which are the public utilities being examined. The case now before this court began as a "Joint Petition for Declaratory Judgment and Injunctive Relief" filed by the plaintiffs in response to the commission's Special Order 8-87. In that order, the commission notified the seven plaintiff cooperatives that it had unanimously decided to assume jurisdiction over them pursuant to its constitutional authority. The order further directed the commission's staff and legal counsel to institute proceedings to examine the rates charged and the services rendered by the cooperatives. The commission's intended proceeding, thus, was a matter affecting services rendered and rates charged. The cooperatives' petition for declaratory and injunctive relief interrupted this proceeding to seek judicial review of a matter affecting services and rates. Accordingly, the professional fees and costs incurred by the commission's special counsel were properly certified to the plaintiff cooperatives.
The proceedings in this case also differ significantly from those in which the commission intervened in the South Central Bell case. Unlike the utilities in that case, the utilities in this case were called before the commission. They are also parties to the proceeding that has resulted in the certification of expenses. Finally, the commission's proceeding in this case would have had a direct effect on the cooperatives' rates.
The judgment of the district court in favor of the commission on the fee issue ordered the cooperatives to pay 90% of the fees and expenses certified to them and 7/13 of the remaining 10%, with the remaining 6/13 certified pro rata to the other cooperatives involved in the commission's docket No. U-17753. Although the district judge gave no reason for this division of the fees, the cooperatives did not challenge this allocation percentage as unreasonable. Nor did they challenge the fees as being unnecessary or arbitrary, except in the context of their broader argument that this proceeding was not one affecting services and rates. Since this case constitutes judicial review of a commission proceeding that began as a rate and services inquiry, this court should find no basis for refusing to uphold the lower court judgment in favor of the commission concerning the commission's certification of fees and costs to the cooperatives.
[1] 1978 La. Acts 77, codified as amended at La.R. S. 45:1163. The 1978 legislation was not a new trend in the history of regulation of electric cooperatives in Louisiana. In 1940, the legislature passed Act 266, which comprehensively dealt with rural electric cooperatives. Section 25 provided: "Cooperatives transacting business in this State pursuant to this Act shall be exempt in all respects from the jurisdiction and control of the Public Service Commission of this State." Subsequent legislation confirmed this legislative policy. See, e.g., 1942 La. Acts 314; 1948 La. Acts 480. In the 49 year history of laws relating to cooperatives in this state, the Public Service Commission has exercised jurisdiction over them for eight years (1970-1978) and that jurisdiction was conferred by legislative act: Act 34 of 1970.
[2] In fact, taken to its logical conclusion, the majority's rationale embeds in the Constitution all statutes in existence in 1974. The majority can point to nothing in the language or the history of Section 21(B) that indicates a particularized intent of the framers to "freeze" only certain statutes relating to the commission into the Constitution. It therefore follows that if the statutes in existence in 1974 relative to the power of the commission are now part of the Constitution, this must be the result of some heretofore undiscovered general rule incorporating all the statutes then in existence into the Constitution. To state this proposition is to demonstrate its legal "absurdity."
[3] The majority's observation that the framers specifically exempted municipally-owned utilities from the commission's jurisdiction is inapposite. This exception was clearly created to serve the interests of intrastate comity, and simply reflects a policy decision to leave municipalities free to regulate purely local entities. Both the language and history of Section 21(C) indicate this provision was not intended as a listing of all entities conceivably designated as "public utilities" that are to be exempt from commission jurisdiction. To conclude otherwise is to assume the framers were acting as a legislature and making legislative policy decisions on the need for regulation in all entities conceivably classifiable as public utilities. Were this true, the framers need not have eliminated the "laundry list" of entities to be regulated found in Art. VI, sec. 4 of the 1921 Constitution. Finally, the inclusion of the "as provided by law" phrase in sec. 21(B) indicates the framers foresaw situations just like the present one where the question of whether to create commission jurisdiction is a policy matter properly for the legislature.
[4] The commission was, of course, aware of the actions of the legislature in 1978 and the effect of the proposed legislation to re-exempt electric cooperatives from commission jurisdiction. Commissioner Lambert and two other members of the commission appeared before the House Committee on Commerce to testify against S.B. 557 which became Act 77 of 1978. House Committee on Commerce, Minutes of Meeting of June 7, 1978 at 6-7.
[5] In State v. City of New Orleans, the Court quoted with approval the opinion of Justice Lamar in United States v. Midwest Oil Co., 236 U.S. 459, 466, 35 S.Ct. 309, 310, 59 L.Ed. 673 (1914):

It may be argued that while these facts and rulings prove a usage, they do not establish its validity. But government is a practical affair intended for practical men. Both officers, lawmakers and citizens naturally adjust themselves to any long-continued action of the executive [or legislative] department on the presumption that unauthorized acts would not have been allowed to be so often repeated as to crystalize into a regular practice. That presumption is not reasoning in a circle but the basis of a wise and quieting rule that in determining the meaning of a statute or the existence of a power, weight shall be given to the usage itselfeven when the validity of the practice is the subject of investigation.
91 So. at 538-539. The commission's repeated denials that it has regulatory jurisdiction over the cooperatives is entitled to similar weight here even though "the validity of the practice is the subject of investigation" in this case.
[6] In fact, under our South Central Bell ruling that the 1974 Constitution did not alter the power of the commission, its acquiescence in legislative jurisdiction over the regulation of cooperatives really dates back to 1940 when cooperatives were first statutorily exempted from commission jurisdiction.
[7] Garkane Power Co. v. Public Service Comm'n, 98 Utah 466, 100 P.2d 571 (1940). The Utah court's analysis was followed by the U.S. Court of Appeals, D.C. Circuit, in Salt River Project Agricultural Improvement and Power Dist. v. Federal Power Comm'n, 391 F.2d 470 (1967), cert. denied, sub nom. Arkansas Valley G & T, Inc. v. Federal Power Comm'n, 393 U.S. 857, 89 S.Ct. 104, 21 L.Ed.2d 126 (1968).
[8] This contradiction is unavoidable in light of our holding in South Central Bell Telephone Co., supra, that the commission possessed no inherent power to assess attorney fees and can do so only by an express grant of authority from the legislature. 412 So.2d at 1073.
[9] Finding a nexus here would require an unconscionably broad reading of the statutory authorization of R.S. 45:1180. Since all costs taxed to the cooperatives are ultimately passed on to their members, any expense the commission imposes may be said to "affect" the rates the cooperatives charge their membership. Such a holding is not in keeping with a pari materia reading of R.S. 45:1180(A) and (B). Section A imposes clear limits on the type of services which the commission can pass on under Section B.
[10] The commission has already denied that it is subject to this generally applicable act designed to assure open and honest government. See State of Louisiana ex rel. Guste, Attorney General v. Louisiana Public Service Comm'n, No. 337,947 (19th Judicial District Court, 1988). After the trial court ruled against the commission, the commission "adopted" the Act's provisions as its own rules.
[11] E.g., R.S. 45:122-125 (electric utilities); R.S. 45:1-10 (airplanes); R.S. 45:61-71 (canals); R.S. 45:161-200 (motor carriers, particularly 45:172 which exempts certain "carriers" from commission regulation); R.S. 45:321-621 (railroads); R.S. 45:671-736 (street railroads); R.S. 45:781-804 (telephones); R.S. 45:1351-1504 (radio and television); and see in particular R.S. 45:841-1244 (general provisions applicable to all carriers and public utilities).