GAIDRY, J.
 

 |2The Louisiana Insurance Guaranty Association (LIGA) appeals a partial summary judgment in favor of one of its member insurers, Louisiana Workers’ Compensation Corporation (LWCC), as well as a judgment denying its cross-motion for summary judgment on the same legal issue. For the reasons described below, we reverse those judgments, granting summary judgment in favor of LIGA and dismissing LWCC’s cause of action.
 

 FACTS AND PROCEDURAL HISTORY
 

 We are called upon in this matter to resolve a dispute between LIGA and LWCC, a member insurer of LIGA, regarding LWCC’s legal liability for assessments made by LIGA. The central issue of the controversy is whether the 1999 constitutional amendment and enabling legislation that authorized LWCC to join LIGA mandate a special method of assessment, unique to LWCC.
 

 All property and casualty insurers licensed and authorized to sell insurance in Louisiana are generally required to be members of LIGA, which by law imposes assessments upon its member insurers to fund its operations. LWCC was created by the legislature in 1991 upon the passage of a constitutional amendment adopting La. Const, art. XII, § 8.1, authorizing such action. LWCC was intended to fill the need for a workers’ compensation insurer of last resort for certain employers, in response to a crisis in availability of such insurance on the open market, and provides only workers’ compensation coverage. Upon its creation, it was expressly prohibited from becoming a member insurer of LIGA. Instead, the state itself guaranteed LWCC’s obligations with its full faith and credit, pending approval by the U.S. Department of Labor for LWCC to provide federal ^Longshore and Harbor Worker’s Compensation coverage without the state’s guarantee.
 
 [1]
 

 By 1999, LWCC was successful in becoming financially stable, and sought the introduction of legislation to terminate the state’s full faith and credit guarantee and to remove the constitutional and statutory prohibition of LWCC’s participation in LIGA and other restrictions on its operations. Accordingly, a constitutional amendment was proposed by the legislature and approved by the voters, removing LWCC’s exemption and prohibition from joining LIGA upon the termination of the full faith and credit guarantee. The legislature also enacted appropriate statutory amendments, which became effective upon the approval of the constitutional amendment. Both the constitutional amendment and the enabling legislation provided that LWCC’s “participation in, contribution to, and protection under” LIGA would be “on a prospective basis only,” applicable to “claims arising from injuries after the ex-tinguishment of the full faith and credit
 
 *1050
 
 guarantee.” On May 1, 2000, LWCC was authorized by the U.S. Department of Labor to provide federal Longshore and Harbor Worker’s Compensation coverage without the state’s guarantee, and the state’s guarantee of its obligations ended. As of that date, LWCC also became a member insurer of LIGA.
 

 LIGA did not assess its member insurers in 2000 or 2001. However, because of insurer insolvencies in 2001 and 2002, it imposed assessments in 2002. LIGA’s first assessment to LWCC was made on May 7, 2002, in the amount of $1,864,911.97, representing 1% of LWCC’s premiums of $186,491,197.00 for the year 2001. By check dated June 4, 2002, LWCC paid that assessment without protest. On December 20, 2002, LIGA made 14another assessment to LWCC in the same amount of $1,864,911.97. By check dated January 17, 2003, LWCC paid that assessment without protest.
 

 On December 5, 2008, LIGA made another assessment to LWCC in the amount of $2,102,139.20, representing 1% of LWCC’s premiums of $210,213,920.00 for the year 2002. At some point, LWCC chose to contest the amount of LIGA’s assessments to it, based upon its interpretation that the 1999 constitutional amendment and legislation exempted LWCC from assessment by LIGA to the extent that the assessment was based upon any claims against insolvent insurers due to injuries occurring prior to the termination of the state’s guarantee (on May 1, 2000), with which its membership in LIGA coincided.
 

 On February 27, 2004, Cherie A. Pinac, LWCC’s director of corporate legal services, wrote to Gillis C. Hill, LIGA’s executive director, enclosing LWCC’s check in the amount of $1,051,069.60, described as representing “a significant partial payment” of the December 5, 2003 assessment. Citing La. Const. Art. XII, § 8.1, Ms. Pinac requested that LIGA provide a “constitutionally-mandated analysis” of those claims upon which the assessment was based, “arising from injuries occurring after [May 1, 2000].”
 

 On March 8, 2004, Ms. Pinac wrote to J. Robert Wooley, the Louisiana commissioner of insurance, advising him of LWCC’s interpretation of its “pro rata” liability to LIGA for assessments, and requested his department’s “guidance and assistance” in determining the “proper accrual” of its liability, based upon the “prospective” nature of its “contribution” to the LIGA fund. In that letter, Ms. Pinac characterized LWCC’s partial payment as “a good faith payment of one-half of the assessment.”
 

 |sOn March 15, 2004, Mr. Hill submitted LIGA’s response to Ms. Pinac’s letter of February 27. Mr. Hill advised her that LIGA disagreed with LWCC’s interpretation of the effect of La. Const, art. XII, § 8.1 and La. R.S. 23:1395(D)(2). He summarized LIGA’s position that no constitutional or statutory authority supported LWCC’s interpretation of its obligation to LIGA for assessments, and that no exceptions or adjustments to assessments were made based upon the year of any insurer’s admission to membership or its subsequent withdrawal before the end of the year. Mr. Hill emphasized that “LIGA’s assessment authority applies equally to each and every insurer authorized to transact insurance in Louisiana,” and that “LWCC, just like any other [m]ember [i]n-surer, is obligated to pay the entirety of any assessment imposed after May 1, 2000.” Finally, he enclosed a “past due notice” for the unpaid balance of the assessment.
 

 On the same date as Mr. Hill’s above letter, Ms. Pinac wrote to Mr. Hill, enclosing LWCC’s check for the assessment bal-
 
 *1051
 
 anee of $1,051,069.60, and reiterated LWCC’s position regarding its interpretation of its liability and its right to a “constitutionally mandated analysis unique to [LWCC] regarding its LIGA contribution.”
 

 On September 1, 2004, LIGA again assessed its member insurers. LIGA issued an assessment of $2,315,230.63 to LWCC, representing
 
 1%
 
 of its premiums of $251,523,063.00 for the year 2003. LWCC has never paid that assessment.
 

 On December 14, 2004, Mr. Wooley wrote to Ms. Pinac in response to her letter of March 8. Observing that “this matter presents
 
 de novo
 
 legal issues that will require constitutional construction, statutory interpretation, and interplay between the applicable provisions,” he advised that as commissioner of insurance, he would take no action relating to the status of |fiLWCC’s license or imposition of penalties pending an expected judicial determination of the dispute.
 

 On December 23, 2004, LWCC filed a petition seeking the recovery of those portions of the three assessments relating to covered claims against LIGA arising prior to May 1, 2000, with accrued interest since LWCC’s payments. It also sought declaratory and injunctive relief. In addition to allegations relating to the history and legal status of both LIGA and LWCC, LWCC’s petition alleged that following the 1999 constitutional amendment “LIGA could not collect any moneys, in 1999 or at any point in the future, from LWCC for matters relating to anything connected with claims from injuries occurring prior to the extin-guishment of the State guarantee [May 1, 2000].” Similarly, it alleged that under both La. Const, art. XII, § 8.1(F) and La. R.S. 23:1395(D), “LIGA could not seek premiums or assessments from LWCC for any claims or injuries that arose prior to the lapse of the full faith and credit guarantee [May 1, 2000].”
 

 LWCC subsequently amended its petition three times before eventually filing a motion for partial summary judgment on October 26, 2007. LIGA responded with a cross-motion for summary judgment. Both motions were heard on December 3, 2007. The trial court granted LWCC’s motion and denied LIGA’s cross-motion. The trial court’s oral reasons for judgment also set forth its reasons for certifying the partial summary judgment in favor of LWCC as final and appealable.
 
 [2]
 
 On December 17, 2007, the trial court signed a combined judgment incorporating its rulings on 17both motions and certifying its judgment as final and appealable.
 
 [3]
 
 LIGA now appeals the partial summary judgment in favor of LWCC, as well as the denial of its motion for summary judgment.
 
 [4]
 

 
 *1052
 
 ASSIGNMENTS OF ERROR
 

 LIGA assigns the following errors by the trial court in rendering its judgment:
 

 I. The trial court erred in its construction of La. Const, art. XII, § 8.1(F) and La. R.S. 23:1395(D)(2).
 

 II. The trial court erred in denying LIGA’s Motion for Summary Judgment seeking dismissal of LWCC’s claim for refund of assessments paid without objection.
 

 III. The trial court erred in denying LIGA’s Motion for Summary Judgment seeking dismissal of LWCC’s claims for payment of a thing not due and unjust enrichment.
 

 DISCUSSION
 

 Standard of Review
 

 The judgment from which this appeal is taken is a partial summary judgment. Appellate courts review summary judgments
 
 de novo
 
 under the same criteria that govern the trial court’s consideration of whether summary judgment is appropriate.
 
 Motorola, Inc. v. Associated Indemnity Corp.,
 
 02-0716, p. 5 (La.App. 1st Cir.6/25/04),
 
 878
 
 So.2d 824, 828,
 
 twits denied,
 
 04-2314, 04-2323, 04-2326, & 04-2327 (La.11/19/04), 888 So.2d 207, 211, & 212. Similarly, in a case involving no dispute regarding material facts, but only the determination of a legal issue, a reviewing court must apply the
 
 de novo
 
 standard of review, under which the trial court’s legal conclusions are not entitled to deference.
 
 Kevin Associates, L.L.C. v. Crawford,
 
 03-0211, p. 15 (La.1/30/04), 865 So.2d 34, 43.
 

 The Louisiana Insurance Guaranty Association
 

 Al 50 states, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands have statutorily created property and casualty insurance guaranty associations to promptly pay the claims of insureds and third-party claimants of insolvent insurers. Al of the statutes establishing these associations, with the exception of that of New York, were based upon the Post-Assessment Property and Liability Insurance Guaranty Association Model Act of the National .Association of Insurance Commissioners (NAIC Model Act). The NAIC Model Act was initially drafted in 1969 in response to federal congressional efforts to address and regulate insurer insolvencies.
 
 [5]
 
 A post-assessment (or post-insolvency assessment) guaranty association based upon the NAIC Model Act assesses its member insurers
 
 following
 
 the insolvency of an insurer, in order to generate a fund to pay the insolvent insurer’s policyholders and insureds as claims become due.
 
 [6]
 

 In 1970, Louisiana enacted its version of the NAIC Model Act, known as the Insurance Guaranty Association Law, La. R.S. 22:1375,
 
 et seq.
 

 [7]
 

 [¡¡LIGA is a
 
 *1053
 
 private, nonprofit, unincorporated legal entity created by statute. La. R.S. 22:1380(A). Although LIGA is not a state agency, it is a legislative creation, which operates within legislative parameters.
 
 La. Ins. Guar. Ass’n v. Gegenheimer,
 
 93-3021 (La.4/21/94), 636 So.2d 209, 210. LIGA is a
 
 sui generis
 
 type of association created by the legislature as a response to the problem of insurer insolvencies, and its solvency in turn has been recognized to be “an appropriate state interest.”
 
 Id.
 
 A statutory enactment that “serves to minimize the unnecessary depletion of LIGA’s funds” has been held to “constitute a legitimate exercise of the state’s police power for the purpose of protecting the state’s citizens from economic harm.”
 
 Segura v. Frank,
 
 93-1271 (La.1/14/94), 630 So.2d 714, 732.
 

 LIGA functions solely and exclusively for public benefit.
 
 La. Ins. Guar. Ass’n v. Comm’n on Ethics for Pub. Employees,
 
 95-0021, p. 10 (La.App. 1st Cir.5/5/95), 656 So.2d 670, 675,
 
 unit denied,
 
 95-1833 (La.11/13/95), 662 So.2d 467. The Insurance Guaranty Association Law “shall be liberally construed to effect the purpose under [La.] R.S. 22:1376, which shall constitute an aid and guide to interpretation.” La. R.S. 22:1378. One of the express statutory purposes of LIGA is to assess the cost of its operations among insurers. La. R.S. 22:1376.
 

 LIGA obtains its funds from assessments on member insurers made pursuant to La. R.S. 22:1382(A)(3)(a), which provides, in pertinent part:
 

 A. The association
 
 shall:
 

 (3)(a)(i) Assess insurers amounts necessary to pay the obligations of the association. ... The assessments of
 
 each member insurer
 
 shall be in the proportion that the net direct written premiums of the member insurer for the preceding [10calendar year, whether or not a company withdraws subsequent to the preceding calendar year, bears to the net direct written premiums of all member insurers for the preceding calendar year-(Emphasis supplied.)
 

 Each assessment, evidenced by a certificate of contribution, is offset against the member insurer’s premium tax liability, not to exceed a total offset of 100%. La. R.S. 22:1382(A)(3)(c);
 
 La. Ins. Guar. Ass’n v. Comm’n on Ethics for Pub. Employees,
 
 95-0021 at p. 9, 656 So.2d at 675. If the assessment paid exceeds the premium tax liability offset, the member insurers may pass on the excess assessment costs to their insureds through premiums, in effect causing an insurer’s insolvency to be borne by all insureds of member insurers rather than only by the policyholders or claimants of the insolvent insurer.
 
 See
 
 La. R.S. 22:1390 and
 
 Ursin v. Ins. Guar. Ass’n,
 
 412 So.2d 1285, 1288 (La.1982) (on rehearing);
 
 see also
 
 La. R.S. 22:1382(A)(3)(e). Louisiana Revised Statutes 22:1382(0(1) provides that “[n]ot-withstanding any other provision to the contrary and unless such other law is specifically excepted from this Section [La. R.S. 22:1382],
 
 the provisions of this Section shall supersede and prevail over any other law to the contrary
 
 ” (Emphasis supplied.)
 

 Louisiana Workers’ Compensation Corporation
 

 LWCC contends that it was “formed under the auspices of La. Const, art. XII, § 8.1” and is thus “a
 
 constitutionally
 
 created entity,” while LIGA is not. LWCC’s chai’acterization of itself as a constitutional
 
 *1054
 
 creation rather than a legislative creation is legally inaccurate. While its creation was authorized by the constitution, the exercise of such authority was delegated to the legislature: “[T]he legislature
 
 by law may create
 
 a private, nonprofit corporation to provide workers’ compensation insurance....” La. Const, art. XII, § 8.1(A). (Emphasis supplied.) Although the LWCC Act was |nenacted prior to the adoption of the constitutional amendment, it only became effective and operative upon approval of the amendment by the voters. Upon the LWCC Act becoming operative, LWCC was statutorily described as a “private, nonprofit corporation,” which “shall not be considered as a state agency.” La. R.S. 23:1393(A)(1), (3).
 

 The purpose behind LWCC’s creation is stated in La. R.S. 23:1391:
 

 A. It is hereby declared by the Legislature of Louisiana that an adequate market for workers’ compensation insurance is necessary to the economic welfare of the state and that without such insurance, the orderly growth and development of the state would be severely impeded; that, furthermore, adequate insurance for workers’ compensation is necessary to enable employers to satisfy their legal obligation under R.S. 23:1168.
 

 B. It is the purpose of the corporation to provide a residual market for those employers that have in good faith, but without success, sought workers’ compensation insurance in the voluntary market of insurance; to provide a competitive market for preferred risk policies as defined herein; and to insure that rates charged are adequate to provide solvency and self-funding of the corporation.
 

 Louisiana Revised Statutes 23:1394 addresses the applicability of other laws to LWCC, as well as potential conflicts between the LWCC Act and the Louisiana Insurance Code, La. R.S. 22:1-2436. It provides, in pertinent part:
 

 A. The corporation shall be subject to all applicable laws of the Louisiana Insurance Code relative to an incorporated domestic mutual insurer,
 
 except as otherwise specifically provided in this Part.
 

 [[Image here]]
 

 C.If a conflict arises in the application of the law, the provisions of this Part shall govern first, followed by the provisions of the Louisiana Insurance Code, and finally, by the provisions of Title 12 of the Louisiana Revised Statutes of 1950. (Emphasis supplied.)
 

 112Interpretation of the Provisions at Issue
 

 The general rule is that articles of the constitution are to be construed and interpreted using the same canons of interpretation applicable to statutes and written instruments.
 
 See State v. Expunged Record (No.) 249,044,
 
 03-1940, p. 4 (La.7/2/04), 881 So.2d 104, 107;
 
 Barnett v. Develle,
 
 289 So.2d 129, 146 (La.1974). Thus, under the well-established rules of statutory construction, any interpretation of constitutional provisions begins with the language of the constitution itself.
 
 Record,
 
 03-1940 at p. 4, 881 So.2d at 107;
 
 Ocean Energy, Inc. v. Plaquemines Parish Government,
 
 04-0066, pp. 6-7 (La.7/6/04), 880 So.2d 1, 7.
 

 When the provision is clear and unambiguous and its application does not lead to absurd consequences, its language must be given effect and its provisions construed so as to accomplish the purpose indicated by a fair interpretation of the language used.
 
 See Perschall v. State,
 
 96-0322, pp. 21-22 (La.7/1/97), 697 So.2d 240, 255;
 
 Cajun Elec. Power Co-op., Inc. v. Louisiana Pub. Serv. Comm’n,
 
 544 So.2d 362, 363 (La.1989) (on rehearing). Un
 
 *1055
 
 equivocal constitutional provisions are not subject to judicial construction and should be applied by giving words their generally understood meaning.
 
 Ocean Energy,
 
 04-0066 at p. 7, 880 So.2d at 7;
 
 Cajun Elec.,
 
 544 So.2d at 368.
 

 Words of art and technical terms must be given their technical meaning when the law involves a technical matter. La. C.C. art. 11. Stated somewhat differently, “[tjechnical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning.” La. R.S. 1:3. Laws on the same subject matter must be interpreted in reference to each other. La. C.C. art. 13.
 

 | mAs originally adopted in 1991, La. Const, art. XII, § 8.1(F) provided as follows:
 

 (F) Guaranty Fund. The corporation shall be exempt from
 
 participation in
 
 and shall not join or
 
 contribute financially to
 
 or be entitled to the
 
 protection of
 
 any plan, pool, association, or guaranty or insolvency fund authorized or required pursuant to the Insurance Code. (Emphasis supplied.)
 

 The original version of La. R.S. 23:1395(D) set out similar language:
 

 Notwithstanding any other law to the contrary, the corporation and its shareholders shall be exempt from
 
 participation
 
 and shall not join or
 
 contribute financially to,
 
 nor be entitled to the
 
 protection of,
 
 any plan, pool, association, or guaranty or insolvency fund authorized or required by the Louisiana Insurance Code; however, the corporation shall pay premium taxes. (Emphasis supplied.)
 

 The original bill introduced in 1999 to amend La. Const, art. XII, § 8.1(F) (House Bill 492) proposed to add the following language:
 

 However, upon the extinguishment of the full faith and credit guarantee of the state, the corporation shall no longer be exempt from
 
 participation in
 
 any plan, pool, association, or guaranty or insolvency fund authorized or required pursuant to the Insurance Code. (Emphasis supplied.)
 

 The final version of La. Const, art. XII, § 8.1(F), as amended in 1999, added the language emphasized below:
 

 (F) Guaranty Fund. The corporation shall be exempt from participation in and shall not join or contribute financially to or be entitled to the protection of any plan, pool, association, or guaranty fund or insolvency fund authorized or required pursuant to the Insurance Code.
 
 Hoivever, upon the extinguishment of the full faith and credit guarantee of the state, the corporation shall no longer be exempt from participation in, contribution to, and protection under the insurance guaranty association fund created and operating under R.S. 22:1375 et seq., of the Insurance Code. The corporation’s participation in, contribution to, and protection under the insurance guaranty association fund shall be on a prospective basis only. This prospective participation, contribution, and protection shall only apply to claims arising from injuries occurring after the extinguishment of the full faith and credit guarantee.
 
 (Emphasis supplied.)
 

 114Similarly, the original bill introduced in 1999 to amend La. R.S. 23:1395(D) (House Bill 493) proposed to add the following language to that statute:
 

 However, upon the extinguishment of the full faith and credit guarantee of the state, as provided in the state constitution, the corporation shall no longer be
 
 *1056
 
 exempt from
 
 participation in
 
 any such plan, pool, association, or guaranty or insolvency fund. (Emphasis supplied.)
 

 The final version of that 1999 enabling legislation added substantially the same language as that of the constitutional amendment to La. R.S. 23:1395(D)(2):
 

 However, upon the extinguishment of the full faith and credit guarantee of the state, which occurs when the United States Department of Labor approves the corporation to provide United States Longshore and Harbor Worker’s Compensation Act coverage without the state guarantee, the corporation shall
 
 participate in, contribute to, and receive protection under
 
 the insurance guaranty association fund created and operating under R.S. 22:1375 et seq., of the Insurance Code. The corporation’s
 
 participation in, contribution to, and protection under
 
 the insurance guaranty association fund shall be on a prospective basis only. This prospective
 
 participation, contribution, and protection
 
 shall apply to claims arising from injuries occurring after the extinguishment of the full faith and credit guarantee. (Emphasis supplied.)
 
 [8]
 

 LWCC emphasizes that the word “contribution” was added to both provisions after their original introduction, and that later addition, in combination with the term “prospective,” evinces the legislative intent to limit any assessment to LWCC to only those covered claims prompting the assessment that arose from “injuries” after May 1, 2000. Thus, LWCC contends that for any such assessment made, all covered claims that arose prior to May 1, 2000 must be determined and removed as a basis for assessment against it, thereby entitling LWCC to a
 
 pro rata
 
 reduction of assessment corresponding to the percentage of the latter claims.
 

 hfiWithin the language added to both provisions in 1999, the words “participation,” “contribution,” and “protection” are used together three times, each time in parallel phraseology related to its mandatory membership in LIGA. In that respect, such usage simply mirrors the language of the first sentence, adopted in 1991, relating to LWCC’s exemption from “participation in,” “eontribut[ion] to,” or “protection of’ LIGA. We perceive no novel meaning or legislative intent in the later addition of the words “contribution” and “protection” to the original versions of the 1999 bills, which referred only to LWCC’s “participation” in LIGA. Rather, the addition of those terms was obviously intended to duplicate the same type of parallel phraseology used in the 1991 constitutional amendment and legislation. The proper interpretation of the 1999 constitutional amendment and legislation must instead rest upon the meaning of the terms “prospective” and “claims arising from injuries.”
 

 Significantly, the adjective “prospective” as used in the 1999 constitutional amendment and legislation modifies not only the term “contribution,” but also the terms “participation” and “protection.” It therefore stands to reason that the meaning of “prospective,” in terms of the effective date of each of those three activities, should be uniform, and the parties seem to agree in this regard. In interpreting the Revised Statutes, “[wjords and phrases shall be read with their context.” La. R.S. 1:3. Taken in its context, the nature of LWCC’s “contribution to” the LIGA fund must be interpreted in the same manner
 
 *1057
 
 as that of its “participation in” and “protection under” the fund, that is, simply by reference to the effective date upon which it became a member insurer.
 

 In its judgment, the trial court held (and LWCC likewise contends) that “[t]he word ‘contribution’ used in La. Const, art. XII, § 8.1(F) and La. |1BR.S. 23:1395(D)(2) is unambiguous and refers to assessments made by LIGA to its member insurers[.]” LWCC’s view of the meaning of “contribution” is, quite simply, incorrect. Its entire argument seems to be founded, for the most part, upon that fundamental misinterpretation. LIGA’s
 
 assessment
 
 to LWCC is not LWCC’s
 
 contribution
 
 to LIGA; it is LWCC’s
 
 payment
 
 of the assessment that constitutes its contribution to LIGA’s operations and mission.
 
 [9]
 
 Thus, we must look to the time of the payment, rather than the time of the assessment in determining whether such is “prospective” relative to LWCC’s membership in LIGA. Additionally, LWCC in effect confuses the time of its required contribution to LIGA with the use to which that contribution is applied. Using LWCC’s historic premiums for the year prior to assessment as the basis for calculation of the assessment, and using that assessment to offset covered claims arising prior to LWCC’s admission to LIGA simply does not amount to an unconstitutional retroactive “contribution” coerced from LWCC. Its contribution (payment of the assessment) is still prospective in nature, that is, assessed and paid after the date of LWCC’s admission as a member insurer.
 

 The parties do not dispute that, in the event of LWCC’s insolvency, LIGA would not assume responsibility for any “covered claims” under LWCC’s policies that arose from injuries that occurred prior to May 1, 2000. Instead, such claims would still be guaranteed by the state under the full faith and credit guarantee. However, part of the 1999 legislation enabling LWCC’s entry into LIGA also included the requirement that LWCC provide Insecurity to insulate the state from ultimate liability on its guarantee. Louisiana Revised Statutes 23:1395(D)(3) provides:
 

 Upon the extinguishment of the full faith and credit guarantee as provided in R.S. 23:1404(B) and in addition to the deposit required by R.S. 22:808, the corporation shall provide one of the following as security to hold the state harmless from all
 
 claims arising from any legal obligation of the corporation
 
 to which the full faith and credit guarantee of the state is pledged:.... (Emphasis supplied.)
 

 The foregoing provision is obviously
 
 in pari materia
 
 with La. R.S. 23:1395(D)(2), as they are part of the same statute and both directly relate to the consequences of the extinguishment of the full faith and credit guarantee in favor of LWCC. We agree with LIGA that the obvious interpretation of “claims arising from injuries” is that such claims are synonymous with “claims arising from any legal obligation of the corporation [LWCC],” rather than “covered claims” against LIGA, as contended by LWCC. The terms “claims” and “covered claims” have distinct and different meanings insofar as LIGA is concerned. LIGA is only responsible for “covered claims,” a statutorily-defined term having a precise, technical meaning. A claim made against a then-solvent member insurer may or may not later become a
 
 *1058
 
 “covered claim” for which LIGA assumes responsibility.
 
 [10]
 
 Reason dictates that if the legislature had intended for the term “claims” to refer to “covered claims” of other insolvent insurers, for which LWCC and other member insurers would be assessed, then it would likely have used that specific term.
 

 |1sWe further agree with LIGA that the use of the term “injuries,” the only type of loss covered under workers’ compensation, is significant. If the legislature had intended the term “claims” to apply to “covered claims” for which LIGA is responsible, it would seemingly have incorporated reference to such claims deriving from damages, losses, or other occurrences not involving “injuries.” Thus, the logical and proper reading of both La. Const, art. XII, § 8.1 and La. R.S. 23:1395(D) is that LWCC’s “prospective ... contribution [to LIGA] shall apply to claims arising from [any legal obligation of LWCC] occurring after [May 1, 2000.]”
 
 [11]
 

 Nothing in the current language of La. Const. Art. XII, § 8.1(F) and La. R.S. 23:1395(D)(2) supports LWCC’s implicit claim of special status akin to that of a corporate “ward of the state,” at least as far as its obligation to pay LIGA assessments is concerned. We need not indulge in detailed efforts to analyze the legislative history of those provisions, as the legislative intent may properly be discerned through analysis of their language and the general principles of statutory interpretation.
 
 See
 
 20 P. Raymond Lamonica & Jerry G. Jones,
 
 Louisiana Civil Law Treatise: Legislative Law and Procedure
 
 § 7.9 (2004). At any rate, the evidence in the record convincingly suggests that in putting the constitutional amendment before the electorate and in enacting La. R.S. 23:1395(D)(2), the legislature was more concerned with protection of LIGA’s solvency from a potential 1^insolvency of LWCC rather than protection of LWCC from assessment by LIGA.
 
 [12]
 

 The legislature chose not to require LIGA to assess its members using separate categories or accounts of insurance business, but to instead assess all member insurers a uniform percentage of their premiums, regardless of the nature of the liability insurance lines written by either the insolvent insurers or the assessed member insurers. As convincingly argued by LIGA, the legislature’s failure to concurrently amend La. R.S. 22:1382(A)(3)(a) to create a unique exception to LIGA’s
 
 mandatory
 
 method of assessment is notably more significant as to its intent than
 
 *1059
 
 the later addition of the “contribution” and “prospective” phraseology in the legislative history of La. Const. Art. XII, § 8.1(F) and La. R.S. 23:1395(D)(2).
 

 Finally, we consider it particularly significant that the final versions of La. Const. Art. XII, § 8.1(F) and La. R.S. 23:1395(D)(2) incorporated a specific reference to “the insurance guaranty association fund created and operating under R.S. 22:1375 et seq., of the Insurance Code.” Both provisions mandate that LWCC “contribute” to LIGA’s operations under La. R.S. 22:1375,
 
 et seq.,
 
 including La. R.S. 22:1382(A)(3)(a). It cannot be presumed that the legislature intended to modify the mandatory provisions of the latter statute and to create a new, more complicated method of assessment for LWCC’s unique benefit, without expressly stating so.
 

 We acknowledge that the questions presented are not simple ones, but we have answered them simply because the simple answers are in fact the best under our rules of constitutional and statutory interpretation.
 
 See Ursin,
 
 |2q412 So.2d at 1290.
 
 [13]
 
 Further, our resolution of these issues accords with the express statutory directives (1) that La. R.S. 22:1382 “shall supersede and prevail over any law to the contrary” and any other law not “specifically excepted” from application of that statute [La. R.S. 22:1382(0(1)]; and (2) that we liberally construe the Insurance Guaranty Association Law, including La. R.S. 22:1382(3)(a), mandating the manner of LIGA’s assessments, to accomplish that law’s purposes [La. R.S. 22:1378].
 

 Our decision also accords with La. R.S. 23:1394(A) and (C), in that the 1999 amendment to La. R.S. 23:1395 removed the only
 
 specific
 
 exception of LWCC from assessments under the mandatory language of La. R.S. 22:1382(3)(a). Thus, LWCC is subject to the mandatory formula of assessment dictated in the latter statute, just as all other domestic mutual insurers are. If LWCC sought and was constitutionally and statutorily granted the benefit of protection by LIGA on the same terms as other member insurers, then it is only logical and fair that it should participate in and contribute to LIGA on the same terms as other member insurers.
 

 DECREE
 

 The partial summary judgment in favor of the plaintiff-appellee, Louisiana Workers’ Compensation Corporation, and against the defendant-appellant, the Louisiana Insurance Guaranty Association, is reversed. The judgment denying the motion for summary judgment of the defendant-appellant, the Louisiana Insurance Guaranty Association, is reversed, and summary judgment is rendered in its favor, dismissing the petition and cause |21of action of the plaintiff-appellee, Louisiana Workers’ Compensation Corporation, with prejudice. All costs of this appeal are assessed to the plaintiff-appellee, Louisiana Workers’ Compensation Corporation.
 

 REVERSED AND RENDERED.
 

 [1]
 

 . La. R.S. 23:1397(0; La. R.S. 23:1404(B)(l)(a).
 
 See also
 
 La. Const, art. XII, § 8.1(B)(2).
 

 [2]
 

 .
 
 See
 
 La. C.C.P. art. 1915(B). We have reviewed the trial court’s oral reasons for certification, and conclude that there was no abuse of discretion.
 
 See R.J. Messinger, Inc. v. Rosenblum,
 
 04-1664, p. 13 (La.3/2/05), 894 So.2d 1113, 1122.
 

 [3]
 

 . The trial court's judgment sets out its certification, but incorrectly purports to also certify its interlocutory judgment denying LIGA's motion as final. A judgment denying a motion for summary judgment is an interlocutory judgment, and cannot be certified under La. C.C.P. art. 1915(B).
 
 Bennett v. Ark. Blue Cross Blue Shield,
 
 05-1714, pp. 3-5 (La.App. 1st Cir.9/15/06), 943 So.2d 1124, 1125-26.
 

 [4]
 

 .We have held that in appropriate cases, when an unrestricted appeal is taken from a final judgment, the appellant is entitled to seek review of all adverse interlocutory judgments prejudicial to him, in addition to the review of the final judgment.
 
 Dean v. Griffin Crane & Steel, Inc.,
 
 05-1226, p. 4 n. 3 (La. App. 1st Cir.5/5/06), 935 So.2d 186, 189 n. 3,
 
 writ denied,
 
 06-1334 (La.9/22/06), 937 So.2d 387. Because the issues involved in the granting of partial summary judgment are identical to those presented by LIGA’s motion
 
 *1052
 
 for summary judgment, it is clearly appropriate to review the interlocutory judgment denying its motion at this time.
 
 Id.
 

 [5]
 

 . Linda M. Lasley,
 
 et al, Insurance Guaranty Funds: The New “Money Pit”?,
 
 416 Practicing Law Inst. Comm'l Law & Practice Handbook Series 113, 115-19 (1987); Davis J. Howard,
 
 Uncle Sam versus the Insurance Commissioners: A Multi-Level Approach to Defining the “Business of Insurance ” under the McCarran-Ferguson Act,
 
 25 Willamette L.Rev. 1, 14 (1989).
 

 [6]
 

 . A pre-assessment (or pre-insolvency assessment) guaranty association assesses its members annually to continuously maintain a fund to be used to pay claims related to future insolvency of member insurers. Howard,
 
 supra
 
 at n. 5.
 

 [7]
 

 . Carey J. Guglielmo & Daniel J. Balhoff,
 
 The ABC's of LIGA,
 
 53 La. L.Rev. 1759, 1759-60 (1993). Effective January 1, 2009, the Insurance Guaranty Association Law was renumbered in the Revised Statutes as La. R.S. 22:2051,
 
 et seq.
 
 Acts 2008, No. 415, § 1.
 
 *1053
 
 Because this action arose and was appealed prior to the renumbering, we have chosen for convenience to use the prior statutory numbering in this opinion.
 

 [8]
 

 . The original 1991 version of La. R.S. 23:1395(D) was designated as La. R.S. 23:1395(D)(1) by the 1999 legislation.
 

 [9]
 

 . To "assess” is "to impose (as a tax) according to an established rate” or "to subject to a tax, charge, or levy.”
 
 Meniam-Webster’s Collegiate Dictionary
 
 74 (11th ed. 2008). An "assessment” is "the action or an instance of assessing.”
 
 Id.
 
 A "contribution,” on the other hand, is "a
 
 payment
 
 (as a levy or tax) imposed by ... civil ... authorities usu. for a special or extraordinary purpose,” or “the act of contributing.”
 
 Id.
 
 at 272.
 

 [10]
 

 . For example, for LWCC's purposes, "profit” is generally defined as income less expenses, and included in such expenses are "claims paid and reserved" and
 
 "claims incurred but not reported."
 
 La. R.S. 23:1392(A)(9). (Emphasis supplied.) A "covered claim” for which LIGA may be liable, on tire other hand, does not include any claim for
 
 "incurred-but-not-reported losses
 
 or unspecified potential losses.” La. R.S. 22:1379(3)(e). (Emphasis supplied.)
 

 [11]
 

 . We cannot help but observe that in its brief to this court, LWCC claims that "LWCC is protected from all of LIGA’s liabilities than can be traced back to
 
 injuries
 
 arising before May 1, 2000, just as LIGA is protected from all of LWCC's liabilities that can be traced back to any
 
 matters
 
 before May 1, 2000.” (Emphasis supplied.) This attempt at semantic distinction is telling. The constitutional and statutory provisions at issue do not make such a distinction between "injuries” [resulting in LIGA covered claims from other insolvent insurers, as LWCC contends] and "matters” [resulting in LIGA covered claims from LWCC's insolvency]. The use of the single term, "injuries,” applicable before or after May 1, 2000, logically demands a single, uniform definition of that term, in turn applicable to a single, uniform definition of "claims.”
 

 [12]
 

 . It is obvious that the "protection” afforded LWCC under La. R.S. 23:1395 is protection
 
 by
 
 LIGA, not
 
 from
 
 LIGA.
 

 [13]
 

 . The venerable philosophical principle known as “Occam’s razor” is not a formal rule of statutory construction, but has often been cited by courts in reaching logical results.
 
 See, e.g., Justiss Oil Co., Inc. v. Kerr-McGee Ref. Corp.,
 
 75 F.3d 1057, 1061 n. 10 (5th Cir. 1996) ("Occam’s, or Ockham’s, razor has been defined as 'the philosophic rule that entities should not be multiplied unnecessarily.’ ”), and
 
 Alabama-Tennessee Natural Gas Co. v. Fed. Power Comm’n,
 
 359 F.2d 318, 335 (5th Cir.1966) (“Occam's razor slices through the arguments based on legislative history and congressional intent.”).